UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION

STEPHEN "MARSHALL" WILSON, as an
Independent Candidate for Governor
of West Virginia and in his Individual Capacity

    *Plaintiff*,

v.                                             Civil Action No. 2:20-cv-526
                                                   (Honorable Thomas E. Johnston)

JIM JUSTICE, Governor of West Virginia,
in his Official Capacity, and
MAC WARNER, Secretary of State for
West Virginia, in his Official Capacity

    *Defendants*.

MEMORANDUM OF LAW
IN SUPPORT OF MOTION TO DISMISS

**CONTENTS**

## INTRODUCTION

On August 4, 2020, Plaintiff Stephen "Marshall" Wilson ("Plaintiff") brought this suit against Mac Warner, in his official capacity as Secretary of State of the State of West Virginia ("the Secretary") and James C. Justice II, in his official capacity as Governor of the State of West Virginia ("the Governor") (collectively, "Defendants"). Cmpl. ¶¶21-22. With a vanishingly small window of time before the content of ballots must be finalized, prepared, and mailed, Plaintiff asks this court to force his inclusion on the 2020 general election ballot as a nonpartisan candidate for governor. Cmpl. ¶¶A-D (at pp.13-14). Because of Plaintiff's unreasonable delay in bringing this suit, the prejudice his delay has caused the Secretary and the public, and the fact that the Governor is immune from the claims raised in this suit, Plaintiff's suit should be dismissed.

## BACKGROUND

**I.   West Virginia's General Election Ballot Procedures.**

"The powers of government reside in all citizens of the state, and can be rightfully exercised only in accordance with their will and appointment." W. Va. Const. art. II § 2. Every two years, the people express their will through elections that determine who will hold the offices entrusted with these powers. By law, these elections must be held on the first Tuesday following the first Monday in November, which in 2020 corresponds to November 3. W. Va. Code § 3-1-31.

Given the foundational importance of these elections, it is of paramount importance that they be conducted in a predictable, fair, and orderly way. *See Anderson v. Celebrezze*, 460 U.S. 780, 788 (1983) ("[T]here must be a substantial regulation of elections if […] some sort of order, rather than chaos, is to accompany the democratic processes."). Nor is it any small undertaking to administer a predictable, fair, and orderly system that can accommodate participation by the State's over 1.2 million registered voters. Ex. A. ¶3. To ensure this system remains predictable, fair, and

orderly, election procedures are established by the West Virginia Legislature and spelled out in Chapter Three of the West Virginia Code ("Chapter Three").

It is impossible to hold an election without an ample supply of ballots. As such, Chapter Three provides a regimented and intricate procedure for preparing and distributing ballots before the first vote can be cast. This procedure is anchored to Election Day and stretches back to the start of the year, requiring coordination between the Secretary, county clerks, county boards of elections, poll workers, vendors, and many others.

These ballots must be procured no later than September 18. Chapter Three requires all county boards of ballot commissioners to print all absentee ballots necessary for the general election and deliver them to their respective county clerks by September 18. W. Va. Code § 3-3-11(a). In practice, this means that all 55 county boards contract with a third party vendor approved by the Secretary in consultation with the state election commission to print their ballots and contract with another third party vendor, specifically, Election Systems & Software, to prepare their voting machines. Ex. A. ¶12. The physical ballots must be ordered, proofed, approved, printed, shipped, and received by September 18. This date is of critical importance because the election code also dictates that September 18 is the day that the county elections officials must begin shipping ballots to all voters who have been approved to vote absentee-by-mail. W. Va. Code § 3-3-5(e)(1). Furthermore, federal law requires that these ballots be shipped to members of the military and other overseas voters by September 19. 52 U.S.C. § 20302(a)(8)(A). The gravity of preparing for compliance with the obligations of these dates is increased dramatically this year due to the COVID-19 pandemic. Election officials are anticipating far higher rates of absentee-by-mail voting in this election than in previous general elections, mirroring or potentially exceeding the increases seen during the primary election earlier this year. Ex. A. ¶¶6-8.

Because it can take county ballot commissioners—and their vendor—several weeks to prepare and print ballots, the content of the ballots must become final several weeks before September 18. Ex. A. ¶14. Chapter Three provides this essential element of finality through a combination of certification cutoffs leading up to the final determination of ballot order on August 25. Candidates nominated to run in the general election through a partisan primary or other nominating procedure were certified for inclusion on the ballot well in advance of this date, though their candidacies could have been withdrawn or suspended at any point up until August 11. W. Va. Code §§ 3-5-11(b)(2), 17, 18, 3-8-7(c)(1). Candidates may instead run without a partisan affiliation, but they must qualify to appear on the general election ballot by obtaining "nomination certificates" signed by 1% of the voting population that voted in the last election for the office sought. W. Va. Code § 3-5-23(c). In the case of the 2020 gubernatorial election, this amounts to 7,139 valid signed certificates, Ex. A ¶5, which needed to be submitted to the Secretary by August 3, W. Va. Code § 3-5-24(a), (b)(1); *see also* W. Va. Code § 2-2-2 (official acts due to be completed on a Saturday are instead to be performed on the next business day).

Ultimately, on August 24, the Secretary must complete the various processes of certifying candidates to be listed on the general election ballot. W. Va. Code § 3-5-18(b). In the case of candidates seeking a nonpartisan listing through nomination certificates, this process requires the Secretary to collaborate with county clerks to confirm that a sufficient number of the candidate's nomination certificates bear a valid signature from a registered voter. W. Va. Code § 3-5-23(e). Once the list of candidates is certified, county boards of ballot commissioners will proceed with setting the order of the candidates' listing on the ballot the next day, August 25. W. Va. Code § 3-6-2(d)(2). In order to ensure their ballots will be printed and available by September 18, many county boards will submit their ballots to the printer on or shortly after August 25. Ex. A ¶18.

## II. Plaintiff's Campaign, The State's COVID-19 Response, And This Lawsuit.

Plaintiff states in his complaint that he has been "diligently campaigning and collecting signatures" to mount an independent campaign for governor "since January of 2020." Cmpl. ¶29.

Plaintiff further states that his efforts to collect the requisite number of signatures to be included on the ballot were frustrated by the COVID-19 pandemic, and more specifically by the Governor's "Stay at Home" order of March 23, 2020. Cmpl. ¶¶36, 41. This order called on all West Virginians to mitigate the spread of COVID-19 by remaining in their homes, unless they were engaged in a number of specified "essential" businesses and activities. Cmpl. Ex. 1. Additionally, individuals who did leave their home for such activities were directed to maintain six-foot distances from others whenever possible. *Id*.

The Governor's "Stay at Home" order was phased out by a subsequent executive order issued on April 30, and has not been in effect since May 4. Cmpl. Ex. 2. Under the terms of the replacement "Safer at Home" order, West Virginians were merely advised to stay home whenever possible, and the six-foot distancing directive remained in effect. *Id*.

Plaintiff's complaint identifies three instances in which he sought to convince the Secretary to suspend or modify the requirements of Chapter Three that relate to independent candidates. *First*, he requested that the Secretary relax the requirement to submit original nomination certificates bearing "wet ink" signatures, so that he could collect signatures electronically. Cmpl. ¶ 42. This request was made to the Secretary's office before March 29. Ex. A ¶20. The Secretary's office informed him that Chapter Three required original "wet ink" certificates, but, based on a proposal by Plaintiff outlining an alternative method for collecting "wet" signatures, the campaign could solicit signatures by electronic means, namely by posting the requisite authorizations to collect signatures and the blank signature certificates online for supporters to

4

print, sign, and physically mail to Plaintiff on their own.[1] Ex. A ¶¶20-24. *Second*, on June 25, he requested that the August 3 deadline to file his nomination certificates be extended. Ex. A ¶26; *see also* Cmpl. ¶43. *Third*, on July 10, he requested that the number of signatures needed to qualify for the ballot be lowered. Ex. A ¶ 27; *see also* Cmpl. ¶44. In each of these final two instances, Plaintiff was separately informed that the Secretary lacked the power to change the requirements of Chapter 3, and that, short of a special session of the Legislature, the only power that could impact the relevant statute was the Governor's emergency power to suspend the provisions of regulatory statutes prescribing the conduct of state business, but only if the statutes impeded the State's ability to respond to a declared emergency. Ex. A. ¶28. Additionally, Plaintiff was informed that the Governor's office had evaluated these requests and determined that the statute at issue did not impede the State's ability to respond to a declared emergency, hence there was not the requisite trigger to allow for any exercise of the Governor's discretionary emergency powers. Ex. A. ¶29. During the last of these communications on or about July 10, Plaintiff or his counsel asked for information on how to sue the State. Ex. A ¶30.

Plaintiff filed his statement of candidacy on the deadline date, August 3, along with "a significant number" of signatures. Cmpl. ¶14. Nonetheless, this "significant number" was lower than the roughly 7,139 required to qualify for certification as a candidate. Thus, the next day— 135 days after the "Stay at Home" order became effective and 93 days after it was lifted—Plaintiff filed this suit to force modifications of these requirements.

---

[1] The Secretary's office has provided this process to multiple other independent candidates as an election code-compliant alternative means of collecting signatures. Ex. A ¶25.

## ARGUMENT

I.  **Plaintiff's Claims Are Barred By The Doctrine of Laches.**

Federal Rule of Civil Procedure 8(c) allows a Defendant to raise the affirmative defense of laches. Fed. R. Civ. P. 8(c). Laches is a defense against equitable claims, and is appropriate where a Defendant can demonstrate two elements: *first*, a "lack of diligence by the party" bringing the claim to be barred; and *second*, "prejudice to the party asserting the defense." *Costello v. United States,* 365 U.S. 265, 282 (1961). "[W]hether laches bars an action depends upon the particular circumstances of the case." *White v. Daniel*, 909 F.2d 99, 102 (4th Cir. 1990) (citing *Nat'l Wildlife Federation v. Burford*, 835 F.2d 305, 318 (D.C.Cir.1987)). "As a result, the equitable balancing of a plaintiff's delay with prejudice to a defendant is primarily left to the sound discretion of the trial court." *Id.* (citing *Lingenfelter v. Keystone Consol. Indus., Inc.*, 691 F.2d 339, 341 (7th Cir.1982)).

Both elements of laches are present here. Plaintiff's challenge arose as a result of the "Stay at Home" order, which was issued 135 days before he filed his lawsuit. His delay in waiting until after the challenged deadline had lapsed was not only inexcusable, but now threatens to destabilize the remaining election calendar to the detriment of the Secretary and the public.

*A.  Plaintiff's delay in bringing this suit was inexcusable and unreasonable.*

The first element of laches, a "lack of diligence," exists where "the plaintiff delayed inexcusably or unreasonably in filing suit." *White*, 909 F.2d at 102 (quoting *Nat'l Wildlife Federation*, 835 F.2d at 318). "An inexcusable or unreasonable delay occurs only after the plaintiff discovers, or with reasonable diligence could have discovered, the facts giving rise to its cause of

6

action." *Fair Woods Homeowners Ass'n v. Pena*, 73 F.3d 357, 1996 WL 1843 *4 (4th Cir. 1996) (citing *White*, 909 F.2d at 102).

The Fourth Circuit has already passed upon when "eleventh hour" "constitutional challenges" to candidate filing regulations rise to the level of inexcusable or unreasonable delay in *Perry v. Judd*, 471 F. App'x 219, 224 (4th Cir. 2012).  In that case, a candidate waited "over four months" to challenge Virginia's requirement that only in-state residents could circulate candidacy petitions.  *Id*.  Critically, the court focused on the fact that the candidate's challenge "became ripe" on "the day on which he declared his candidacy." *Id*.  At that point, he had "every incentive to challenge the requirement," yet he "chose to sit on his right to challenge this provision until after he had been denied a place on the ballot" due to a shortage of signatures—ostensibly attributable to the restrictions on who could circulate his petitions." *Id*. at 224, 225.  The Fourth Circuit held this "deliberate delay preclude[d] the possibility of equitable relief," as "'equity ministers to the vigilant, not to those who sleep upon their rights.'" *Id*. at 224 (quoting *Texaco P.R., Inc. v. Dep't of Consumer Affairs,* 60 F.3d 867, 879 (1st Cir.1995)).

The same types of knowledge, incentives, and timeline exist here and highlight the same unreasonable and inexcusable delay in this eleventh-hour challenge as in *Perry*.  Plaintiff's causes of action arise from a combination of the COVID-19 pandemic and the "Stay at Home" order. Cmpl. ¶58.  Plaintiff was or should have been aware that the "Stay at Home" order applied to his

signature-gatherers from the moment the order was issued,[2] which as in *Perry* took effect "over four months" before he chose to bring this suit. *Perry*, 471 F. App'x at 225. Plaintiff's attempts to secure an exception from the signature requirements and deadlines confirm this—Plaintiff would not have sought to modify a requirement that he did not realize applied to him, thus illustrating that he had "every incentive to challenge the law" at the time the Order was issued. *Id*. Plaintiff does not allege that he believed any such modification was forthcoming, but, even assuming *arguendo* that he did, his belief would not excuse his neglect in failing to file suit. The question is not whether Plaintiff believed he could successfully lobby for a change in the law that would moot his cause of action; only whether he "discover[ed], or with reasonable diligence could have discovered," that his purported cause of action *existed in the first place*. *Fair Woods*, 1996 WL 1843 at *4. He could have—indeed, he did—and thus his failure to act over the next 135 days was inexcusable and unreasonable.

      B.    *Defendants and the public were prejudiced by Plaintiff's inexcusable and unreasonable delay.*

"Ballots and elections do not magically materialize," but "require planning, preparation, and studious attention to detail if the fairness and integrity of the electoral process is to be observed." *Perry*, 471 F. App'x at 226. A defendant, and in particular a state election official, is

---

[2] This is unquestionably true in light of Plaintiff's active and ongoing signature-gathering activities that began in January, well more than a month before the state of emergency and "Stay at Home" order were issued. Cmpl. ¶29.

8

prejudiced by inexcusable and unreasonable delays when these careful plans and preparations are "thrown into far greater confusion than would have been the case with a timely legal action." *Id*.

For example, in *Perry*, Virginia elections officials "testified without contradiction that printing ballots is complex and requires a number of technical steps to imbed information into the ballots themselves and to program computers to count them." *Id.* (citation omitted). Many of these steps, including the approval of proof ballots and submission of ballots to printers, had been completed before the first hearing on plaintiff's preliminary injunction could be held. *Id*. at 227.

Thus, the *Perry* court concluded that the plaintiff's "lack of diligence" prejudiced elections officials by "disrupt[ing] the[ir] carefully planned schedule for meeting [subsequent deadlines], creating confusion for election officials across the state." *Id*. The court emphasized that the "requested relief" of including candidates on the ballot at such a late stage "would force expensive reprinting of ballots" as well as "other delays" that "would likely prevent respondents from complying with their obligations under federal and state law," such as the requirement to provide absentee ballots to overseas voters 45 days before the election. *Id*. (citing 42 U.S.C. § 1973ff-1 (recodified at 52 U.S.C. § 20302)). The plaintiff's delay in that case similarly "ma[de] it all the more difficult to determine with any confidence whether a particular injury is even traceable to the allegedly unconstitutional residency requirement," as it was mere "counterfactual speculation" that he "would have met the [] signature threshold if only he had been allowed to use non-Virginia residents to gather signatures." *Id*. at 225 (citation omitted).

The *Perry* court went on to note that "the Supreme Court has repeatedly expressed its disapproval of such disruptions," which extend beyond the named parties and harm the public as well. *Id*. "[T]he Supreme Court has repeatedly credited" the State's interest in safeguarding "the uniformity, fairness, accuracy, and integrity" of elections." *Id*. at 227 (citing *Clements v. Fashing*,

9

457 U.S. 957, 965 (1982); *Jenness v. Fortson,* 403 U.S. 431, 442 (1971)). Where the State's ability to advance that interest is harmed by a litigant's unreasonable delays, then "in a broad sense, the public is potentially prejudiced as well." *Id.*; *see also White*, 909 F.2d at 103 (holding that inexcusable and unreasonable delays in initiating election litigation "necessarily impose great disruption upon potential candidates, the electorate and the elective process" (quoting *Maryland Citizens for A Representative Gen. Assembly v. Governor of Md.*, 429 F.2d 606, 610 (4th Cir. 1970)).

These same disruptions will play out here if this litigation is not dismissed. There are 4 days remaining—including a weekend—between the filing of this motion and when the Secretary must certify the final list of candidates on August 24. W. Va. Code § 3-5-18(b). Even this vanishingly small window is only possible due to Defendants' proactive efforts to remedy Plaintiff's delay; Defendants were entitled to take an additional 6 days to respond to this suit under Rule 12(a)(1)(A)(i), in which case this Court would not have received even the first responsive pleading until two days *after* the certification deadline. And this is to say nothing of any response to and hearing on Plaintiff's motion for preliminary injunction. It is simply impractical to suggest that this litigation can be resolved before the county boards need to set their ballot orders and begin printing their ballots—notably at the same time that other states are simultaneously seeking expeditious printing of their respective ballots from the same vendor. Even if a hearing were held and the matter somehow resolved before this date, any appeal would necessarily play out while ballots were being printed.

Thus, at this point in time, there is simply no realistic way that Plaintiff's requested relief would **not** prejudice the State and the public. As in *Perry*, West Virginia election officials are facing numerous critical deadlines—both legal and practical—if they are to print, receive, and

10

begin delivering ballots to West Virginia absentee voters and uniformed overseas voters by September 18—a scant 24 days after setting the order for ballots. Plaintiff asks this Court to include his name on the ballot, Cmpl. ¶C (at pp. 13-14), the same remedy the Fourth Circuit rejected as inappropriate to request at this belated stage, *Perry*, 471 F. App'x at 225. But he goes further, asking in the alternative for a *further* delay in the election calendar to obtain additional signatures, Cmpl. ¶C (at pp. 13-14), which merely compounds the "counterfactual speculation" that the additional time would enable him to gather the necessary signatures, *Perry*, 471 F. App'x at 225.

Even under normal circumstances, it would jeopardize the government's ability to deliver on statutory obligations if forced to delay—much less halt and restart—the printing process in the final stages. And these are not normal circumstances. There is an unprecedented level of demand for absentee ballots both in West Virginia and nationwide, which only increases the expense and impracticality of disrupting counties' and vendors' otherwise-predictable timetables.

This significant prejudice could have been mitigated, if not avoided entirely, if Plaintiff had brought his suit when he first learned about the "Stay at Home" order. Because he chose not to do so, choosing instead to wait until there was no play left in the joints of the West Virginia election calendar, his claim should be barred under the doctrine of laches.

**II.     The Eleventh Amendment Bars This Suit Against The Governor.**

"Without jurisdiction the court cannot proceed at all in any cause." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998) (quoting *Ex parte McCardle*, 7 Wall. 506, 514 (1868)). Thus, when a court lacks jurisdiction to hear a suit, the suit must be dismissed under Federal Rule of Civil Procedure 12(b)(1). In addition to being untimely and barred by the doctrine of laches, *see* Part I, *supra* pp. 6-11, Plaintiff's claims against the Governor fail to articulate facts that fall

11

within a federal court's jurisdiction. Thus, these claims should be dismissed for that independent reason.

West Virginia's Constitution is clear: the State "shall never be made defendant in any court of law or equity." W. Va. Const. art VI, § 35. The Eleventh Amendment applies this jurisdictional limitation to the federal courts. *Hans v. Louisiana*, 134 U.S. 1 (1890). Moreover, suits against officers of the State in their official capacities are effectively suits against the State. *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71 (1989). Consequently, "federal courts may not entertain a private person's suit against" the State or its officers acting in their official capacity unless the State waives its sovereign immunity or the federal government abrogates it. *Va. Office for Prot. & Advocacy v. Stewart*, 563 U.S. 247, 253 (2011). Neither condition is satisfied here: Plaintiffs have not alleged waiver or abrogation, and there is no plausible basis on which they could.

Nor does the narrow exception to the general rule of sovereign immunity in *Ex parte Young* apply here. Federal courts may hear suits against state officers in their official capacity if—and only if—the official is "clothed with some duty in regard to the enforcement of the laws of the state" *and* "threaten[s] and [is] about to commence proceedings, either of a civil or criminal nature, to enforce against parties affected an unconstitutional act." *Ex parte Young*, 209 U.S. 123, 155–56 (1908). In those circumstances, the official "may be enjoined by a Federal court of equity from such action." *Id*.

The *Ex parte Young* exception is thus designed to protect against imminent enforcement of an unconstitutional statute, not to provide a broad avenue to challenge state policies with which a plaintiff disagrees. Because sovereign immunity is "a structural definition of our constitutional system" that "has never been doubted," *Okpalobi v. Foster*, 244 F.3d 405, 411 (5th Cir. 2001) (*en*

12

*banc*), the United States Supreme Court has demanded that exceptions to state immunity from suit be "narrowly construe[ed]." *Pennhurst State School and Hosp.*, 465 U.S. at 105, 114 n.25 (1984). Therefore, there must be a "'special relation' between the officer being sued and the challenged statute" before *Ex parte Young* applies. *McBurney v. Cuccinelli*, 616 F.3d 393, 399 (4th Cir. 2010) (quoting *Young*, 209 U.S. at 157). This requirement "is not met when an official merely possesses "[g]eneral authority to enforce the laws of the state." *Id.* (quoting *S.C. Wildlife Fed'n v. Limehouse*, 549 F.3d 324, 331 (4th Cir.2008)); *see also Vote No on Amendment One, Inc. v. Warner*, 400 F.Supp.3d 504, 513 (S.D. W.Va. 2019) ("This 'special relation' requirement . . . has been a bar to injunctive actions where the relationship between the state official sought to be enjoined and the enforcement of the state statute is significantly attenuated." (quotation omitted)).

Plaintiffs' claims against the Governor do not satisfy either requirement of *Ex Parte Young*. *First*, the Governor is not "clothed in an official duty" with respect to Sections 3-5-23 and 3-5-24. Rather, "the nomination certificate required" by these Sections is filed with the Secretary, W. Va. Code § 3-5-24(b)(1), and the ballots are ultimately prepared by county boards of ballot commissioners, W. Va. Code § 3-3-11. The Complaint offers—without elaboration or citation—that the Governor "has authority over the enforcement of the West Virginia Election Code during a state of emergency and otherwise," Cmpl. ¶21, but "[g]eneral authority to enforce the laws of the state" does not satisfy this requirement. *McBurney*, 616 F.3d at 399. Similarly, "[s]o long as a state of emergency or state of preparedness exists, the Governor . . . *may* exercise" the power to "[t]o suspend the provisions of any regulatory statute prescribing the procedures for conduct of state business, if strict compliance therewith would in any way prevent, hinder or delay necessary action in coping with the emergency." W. Va. Code § 15-5-6(c)(7) (emphasis added). But this is a quintessential discretionary power that the Governor "may" exercise if—in his sole

determination—a statute hinders an action that he considers "necessary" in addressing an emergency. *Id*. And as the Court explained in *Ex parte Young* itself, "[t]here is no doubt that [federal] court[s] cannot control the exercise of the discretion of an officer," but "can only direct affirmative action where the officer having some duty to perform not involving discretion, but merely ministerial in its nature, refuses or neglects to take such action." 209 U.S. at 158.

*Second*, the Plaintiffs' complaint does not allege that the Governor threatened to commence civil or criminal proceedings arising from *any* portion of the Election Code, much less the challenged provisions. Indeed it could not; the only enforcement actions contemplated in the challenged provisions are initiated by the Attorney General or county prosecutors, *see* W. Va. Code § 3-5-23(e), and even these only apply where the validity of signatures is called into question. And as explained previously, it is the Secretary who will certify the list of candidates to the county boards on August 24. The Governor is quite simply not involved.

Without "an actual enforcement connection—some enforcement power or act that can be enjoined," Plaintiffs have alleged no facts that could support an exception to West Virginia's sovereign immunity. *Okpalobi*, 244 F.3d at 411. Therefore, Plaintiff's claims against the Governor are beyond this Court's jurisdiction and must be dismissed.

## CONCLUSION

For the foregoing reasons, this Court should dismiss Plaintiffs' complaint.

Respectfully submitted,

/s/ *Curtis R.A. Capehart*

Curtis R.A. Capehart
Deputy Attorney General
(WV Bar No. 9876)
Thomas T. Lampman
(WV Bar No. 13353)
Assistant Solicitor General

OFFICE OF THE WEST VIRGINIA
ATTORNEY GENERAL
State Capitol
Building 1, Room E-26
Charleston, WV 25305-0220
Telephone: (304) 558-2021
Facsimile: (304) 558-0140
Email:
thomas.t.lampman@wvago.gov

*Counsel for Mac Warner, Secretary of State of the State of West Virginia, in his official capacity as Secretary of State*

DATE: August 20, 2020

## CERTIFICATE OF SERVICE

I hereby certify that on this 20th day of August, 2020, the foregoing has been served electronically on all parties represented by counsel using the Court's CM/ECF system.

/s/ *Curtis R.A. Capehart*

Curtis R.A. Capehart
Deputy Attorney General
(WV Bar No. 9876)
Thomas T. Lampman
(WV Bar No. 13353)
Assistant Solicitor General

OFFICE OF THE WEST VIRGINIA
ATTORNEY GENERAL
State Capitol
State Capitol
Building 1, Room E-26
Charleston, WV 25305-0220
Telephone: (304) 558-2021
Facsimile: (304) 558-0140
Email: thomas.t.lampman@wvago.gov

*Counsel for Mac Warner, Secretary of State of the State of West Virginia, in his official capacity as Secretary of State*